FOR PUBLICATION                                              [Docket No. 8]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |
|---|---|
| MUSIC SALES LIMITED, et al., | |
| Plaintiffs, | Civil No. 09-1443 (RMB/JS) |
| v. | |
| CHARLES DUMONT & SON, INC., | **OPINION** |
| Defendant. | |

Appearances:

Gary P. Schulz
Laurin H. Mills
Benjamin T. Hickman
Nixon Peabody LLP
50 Jericho Quadrangle, Suite 300
Jericho, NY 11753-2728

    Attorneys for Plaintiffs

Betsy G. Ramos
Michelle L. Corea
Capehart & Scatchard
Laurel Corporate Center
8000 Midlantic Drive, C.S. 5016, Suite 300
Mount Laurel, NJ 08054

    Attorneys for Defendant.

**BUMB**, UNITED STATES DISTRICT JUDGE:

         "I never heard so musical a discord . . . ."
                    William Shakespeare
                    A Midsummer-Night's Dream act 4, sc. 1.

    The largest printers and distributors of sheet-music in

Europe, Music Sales Limited and Farber Music Limited,

(collectively, the "Plaintiffs") brought this suit pursuant to the Copyright Act, 17 U.S.C. § 501 et seq., to enforce their exclusive licenses to print and distribute sheet-music in Europe. New Jersey-based sheet-music distributor Charles Dumont & Son, Inc. (the "Defendant") has, according to the Complaint, unlawfully exported from the United States to Europe sheet-music covered by Plaintiffs' exclusive distribution licenses.

Plaintiffs originally sought to enforce their European distribution licenses in the courts of the United Kingdom, and, on October 18, 2002, Plaintiffs and Defendant agreed to the entry of a Consent Order in a British court, pursuant to which Defendant agreed to cease its allegedly infringing activities in the United Kingdom.  (Pl.s' Br. 12.)  However, since the Consent Order was entered, according to Plaintiffs, Defendant has been "distribut[ing] infringing sheet music from the United States into Europe with impunity."  (Pl.s' Br. at 2.)

Plaintiffs now seek to enforce their European licenses in a United States court.  On March 29, 2009, Plaintiffs filed the present Complaint for copyright infringement.  Plaintiffs allege that Defendant has been shipping sheet-music from the United States into Europe since at least 2006.  They seek damages and injunctive relief because, they allege, Defendant's distribution of sheet-music in Europe infringes upon Plaintiffs' exclusive distribution rights.

Importantly, the Complaint alleges only that the unauthorized <u>distribution</u> of sheet-music in Europe constitutes copyright infringement. Defendant has proffered, and the Court has no reason to doubt, that Defendant has been granted exclusive licenses to distribute in the United States the sheet-music at issue in this action. Accordingly, the Complaint contains no allegation that Defendant has copied the sheet-music unlawfully, nor that its distribution of the sheet-music within the United States is unlawful.

The Court now considers Defendant's motion to dismiss the complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief may be granted, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).[1] Having concluded that the Copyright Act does not confer standing upon Plaintiffs, the Court will grant the motion to dismiss.[2]

---

[1] Defendant filed this motion on May 4, 2009. The Court requested that the parties prepare supplemental briefing to address whether recent amendments to the Copyright Act, 17 U.S.C. 602(a)(2) <u>as amended by</u> the Prioritizing Resources and Organization for Intellectual Property Act of 2008 ("PRO-IP Act") Pub. L. No. 110-403, 122 Stat. 4256 (2008)), affect the disposition of the pending motion. All parties agreed, however, that they do not. (Pl.s' 1st Supp. Br. 1; Def.'s 1st Supp. Br. 1.) The Court heard oral argument on the motion on September 21, 2009 and again requested that the parties submit supplemental briefing to address concerns raised by the Court at that hearing.

[2] At oral argument, the Court inquired as to why no other reported cases present this particular set of facts. Indeed, when distribution rights are divided regionally, it must be a frequent occurrence that one distributor sends the licensed work into another distributor's territory (even if by accident). When

**LEGAL STANDARD**

Defendant brings this motion to dismiss pursuant to both Rules 12(b)(6), for failure to state an actionable claim, and 12(b)(1), for lack of subject-matter jurisdiction. In deciding a Rule 12(b)(6) motion, courts must view all allegations in the complaint in the light most favorable to the plaintiff, Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994), and accept any and all reasonable inferences derived from the facts alleged, Unger v. Nat'l Residents Matching Program, 928 F.2d 1392 (3d Cir. 1991). Based upon the face of the complaint, courts must decide if "enough facts to state a claim for relief that is plausible on its face" have been alleged. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). Courts must review the complaint to determine: (1) if it alleges genuine facts, rather than mere legal conclusions; (2) if the facts alleged (assumed to be true), as well as the reasonable inferences drawn therefrom, establish a claim; and (3) if relief based upon the facts alleged is plausible. Ashcroft v. Iqbal, 129 S. Ct. 1937,

---

asked, neither party offered an answer that satisfied the Court's curiosity. Upon reflection, the Court now believes that this sort of case has not arisen before because enforcing a foreign judgment against an American company in the foreign jurisdiction is feasible when the company has substantial contacts with that jurisdiction. Defendant is apparently uniquely situated because it is a small company that does little or no business in Europe, making European enforcement more difficult. Plaintiffs have therefore taken the unprecedented step of seeking enforcement in the United States.

1949-50 (2009).

Rule 12(b)(1) motions may challenge subject-matter jurisdiction based upon the complaint's face or its underlying facts.  Pittman v. Metuchen Police Dept., No. 08-2373, 2009 WL 3207854, *1 (D.N.J. Sept. 29, 2009) (citing James Wm. Moore, 2 Moore's Federal Practice § 12.30[4] (3d ed. 2007)).  "A facial attack questions the sufficiency of the pleading, and in reviewing a facial attack, a trial court accepts the allegations in the complaint as true."  Id.  A factual attack, by contrast, calls upon the court to engage in a weighing of the evidence.  Id.  Here, the Court will presume the truth of Plaintiffs' allegations, since the motion challenges only the sufficiency of the Complaint.

## DISCUSSION

### A.   Statutory Standing

For a federal court to have subject-matter jurisdiction over an action, the plaintiff must have standing to bring the action in the first instance.  As a general matter, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  There are three types of standing: constitutional, prudential, and statutory.  "Though all are termed 'standing,' the differences between [them] are important.  Constitutional and prudential standing are about,

respectively, the constitutional power of a federal court to resolve a dispute and the wisdom of so doing. Statutory standing is simply statutory interpretation: the question it asks is whether Congress has accorded <u>this</u> injured plaintiff the right to sue the defendant to redress his injury." <u>Graden v. Conexant Systems Inc.</u>, 496 F.3d 291, 295 (3d Cir. 2007) (emphasis original). A federal court lacks subject-matter jurisdiction over an action when the plaintiff cannot establish statutory standing. <u>See</u> <u>United States v. $487,825.000 in U.S. Currency</u>, 484 F.3d 662, 664 (3d Cir. 2007) ("In order to stand before a court . . . , a claimant must meet both Article III and statutory standing requirements."). The issue now before the Court is whether the Copyright Act confers standing upon a foreign license-holder to bring suit for exportation from the United States of material licensed for distribution abroad.

    B.   **<u>The Copyright Act</u>**

The United States Constitution grants to Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings . . . ." U.S. Const., art. 1, § 8. Pursuant to this power, Congress enacted the Copyright Act of 1976, which guarantees to authors a medley (or "bundle") of rights in their work, including the rights of reproduction, adaptation, performance, display, and, of importance here,

distribution.  See 17 U.S.C. § 106.  Section 501 of the Copyright Act grants to authors or their successors-in-interest the right to bring an enforcement action; specifically, it provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of § 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it."  17 U.S.C. § 501.

Unauthorized distribution of a work protected by the Copyright Act may constitute copyright infringement and may give rise to a cause of action in federal court.  See 17 U.S.C. § 106(3) ("[T]he owner of copyright . . . has the exclusive rights . . . to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . .").  The right of distribution may be assigned to another party.  See 17 U.S.C. § 101 (providing for the "transfer of copyright ownership" by way of "exclusive license").  Furthermore, the right is divisible such that a party may be assigned the exclusive right to distribute a work in a particular geographic region.  See id. (permitting the licensure of "any of the exclusive rights comprised in a copyright" (emphasis added)).

The Copyright Act does not have extraterritorial effect, however.  See Robert Stigwood Group Ltd. v. O'Reilly, 530 F.2d 1096, 1101 (2d Cir. 1976) ("Copyright laws do not have

7

extraterritorial operation. The [unauthorized] Canadian performances, while they may have been torts in Canada, were not torts here." (citations omitted)). In other words, the distribution right created by § 106(3) refers only to distribution within the United States; the Copyright Act takes no position on the lawfulness of unauthorized distribution abroad.[3] See Subafilms, Ltd. v. MGM-Pathe Communications Co., 24 F.3d 1088, 1094 (9th Cir. 1994) ("Because the copyright laws do not apply extraterritorially, each of the rights conferred under the five section 106 categories must be read as extending 'no farther than the [United States'] borders.'" (quoting Paul Goldstein, 2 Copyright: Principles, Law and Practice § 16.0, at 675 (1989)); see also Matthew S. Miller, Piracy in Our Backyard: a Comparative Analysis of the Implications of Fashion Copying in the United States for the International Copyright Community, 2 J. Int'l Media & Ent. L. 133, 134 (2008) ("[T]he protections afforded to copyright owners under domestic copyright laws do not extend beyond national borders."). Of course, a copyright owner has foreign distribution rights as well; those foreign rights, however, are manifestations of foreign law. See id. ("[W]hether

---

[3] At oral argument, Plaintiffs argued that § 106(3) protects "worldwide distribution rights", not merely the right of distribution within the United States. (Tr., Sept. 21, 2009, 26:15-21.) Plaintiffs have cited no authority for this controversial proposition and the Court finds it to be out of unison with the governing law.

a work that is afforded copyrighted protection in the United States will enjoy the same level of copyright protection abroad, or any protection at all, will depend on the governing laws of the country where an alleged infringement occurs."). Notably, the Berne Convention for the Protection of Literary and Artistic Works ensures a baseline of copyright protection in all 164 party-states.[4]  828 U.N.T.S. 221, July 24, 1971 (originally signed Sept. 9, 1886) (implemented in the United States by the Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853 (1988)).  Nonetheless, unauthorized distribution abroad of copyrighted work does not contravene the Copyright Act.

The general rule that foreign conduct does not give rise to a cause of action under the Copyright Act has one "established exception":  A person who commits infringing acts within the United States may be held liable for causing, by their infringing acts, the unauthorized use of the material abroad.  See John Gladstone Mills III, et al., 2 Pat. L. Fundamentals § 6:139 (2d ed. WL 2009) ("An established exception provides that extraterritorial acts are subject to the U.S. copyright law when there is infringement within the United States that permits further reproduction abroad.").  In the leading case Peter Starr Production Co. v. Twin Continental Films, Inc., 783 F.2d 1440

---

[4] Plaintiffs have not raised a claim under the Berne Convention, its implementing regulations, or any other international treaty.

(9th Cir. 1986), the defendant executed a contract in the United States that authorized a third party to exhibit a film abroad without the consent of the film's copyright owner. Because the court found the defendant's <u>authorization</u> of the exhibition to be an <u>infringing act in itself</u>, it held that defendant's act fell within the scope of United States copyright laws. <u>Id.</u> at 1443.[5] Importantly, the court did <u>not</u> hold that the Copyright Act applied to the third party's foreign exhibition. See <u>Subafilms</u>, 24 F.3d at 1091 ("The <u>Peter Starr</u> court accepted . . . that the acts . . . themselves could not have constituted infringement under the Copyright Act."). In another case applying this

---

[5] Notably, the <u>Peter Starr</u> Court relied upon the text of § 106, which grants to a copyright owner the "exclusive right[] to . . . authorize" the exhibition of its film. The act of authorizing, which occurred in the United States, was itself infringing conduct, regardless of whether the film had ultimately been shown within or outside the United States, on the moon, or not at all. <u>See also</u> <u>Fantasy v. Fogerty</u>, 664 F. Supp. 1345, 1351 (N.D. Cal. 1987) (refraining from determining the application of U.S. copyright laws to defendant's foreign profits until the jury could decide whether defendant's activity within the United States constituted an infringement).
    Singing a somewhat different tune in the later case <u>Subafilms, Ltd. v. MGM-Pathe Communications Co.</u>, the Ninth Circuit reversed itself and, abrogating <u>Peter Starr</u>, held that the domestic authorization of the misuse of copyrighted materials abroad does not constitute infringement. 24 F.3d 1088, 1090 (9th Cir. 1994). Some courts, including one in this District, have nonetheless continued to follow the <u>Peter Starr</u> rule. <u>See, e.g.</u>, <u>Expediters Int'l of Washington, Inc. v. Direct Line Cargo Management</u>, 995 F. Supp. 468, 477 (D.N.J. 1998) ("[A]uthorization of infringing acts abroad constitutes direct infringement and is actionable under United States Copyright Law."). Even were the <u>Peter Starr</u> rule controlling, Plaintiffs would not prevail here, as no predicate act of infringement occurred within the United States in this case.

exception, Update Art, Inc. v. Modiin Pub., Ltd., the defendant, an Israeli newspaper publisher, had reprinted a poster without authorization. 843 F.2d 67, 68-69 (2d Cir. 1988). Although the offending newspapers had been printed in Israel, the Court sustained the copyright infringement action because the initial infringing copy, which was later reproduced in the Israeli newspaper, had been created unlawfully in the United States. Id. at 73. The scope and effect of the exception illustrated by Peter Starr and Update Art should not be amplified: "Cases which have asserted jurisdiction based on the application of copyright laws have uniformly found some act of infringement in the U.S." Zenger-Miller, Inc. v. Training Team, GmbH, 757 F. Supp. 1062, 1072 (N.D. Cal. 1991) (emphasis added); see also De Bardossy v. Puski, 763 F. Supp. 1239, 1243 (S.D.N.Y. 1991) (holding that "jurisdiction [is] proper in the United States . . . if [a] plaintiff can show that an infringing act occurred in the United States").

    C.    **"Extraterritorial" Character of Conduct "Occurring" within the United States**

Based upon the foregoing, "in order for the [C]ourt to exercise subject matter jurisdiction over [P]laintiff[s'] claims, [P]laintiff[s] bear[] the burden of alleging and proving that [D]efendant is liable . . . for an act of infringement committed in the United States." ITSI T.V. Productions, Inc. v. California Authority of Racing Fairs, 785 F. Supp. 854, 863-64 (E.D. Cal.

11

1992) (emphasis added), aff'd in part, rev'd in part on other grounds, 3 F.3d 1289 (9th Cir. 1993).

Here, Plaintiffs' entire argument can be reduced to the simple proposition that the distribution of sheet-music from the United States into Europe is not "extraterritorial".[6] The argument, alluring as the music of the mythical Sirens, is misleading in its simplicity. In short, Plaintiffs are asking the Court to hold that any act occurring within the United States that causes the unauthorized use of copyrighted material abroad is actionable under the Copyright Act. This strikes a discordant note. The clear governing legal rule is that the predicate act occurring in the United States must itself constitute

---

[6] Plaintiffs' observation that Defendant's misconduct "occurred" in the United States is perplexing. To establish that Defendant infringed upon Plaintiffs' license, Plaintiffs must argue that the act of distribution occurred in Europe. Confoundingly, to establish this Court's subject-matter jurisdiction, Plaintiffs now assert that the act of distribution occurred in the United States. If the distribution occurred in the United States, however, one wonders how Defendant could have exceeded its license, which purportedly permits Defendant to distribute the sheet-music in the United States. The better view harmonizes the situs of Defendant's conduct for purposes of liability with the situs of the same conduct for purposes of jurisdiction. Defendant's conduct -- exportation -- is in fact two acts: transporting and distributing. However, Plaintiffs do not allege that transporting the copies is unlawful (if Defendant had traveled to Europe with the copied music and not distributed it, there would have been no wrongdoing); rather, the misconduct is the distribution of the music in Europe, which occurred outside the United States. In any event, regardless of whether Defendant's conduct is said to occur in the United States or Europe, the conduct was clearly not infringement under the Copyright Act, which is a necessary condition to establish this Court's jurisdiction.

<u>infringement</u> under the Copyright Act.  Here, Defendant's unauthorized distribution abroad of copyrighted material does not constitute infringement under the Copyright Act.  <u>See</u> discussion <u>supra</u> pages 7-9.  The mere fact that Defendant undertook to export sheet-music from within the United States is inapposite.  If Defendant had made <u>unauthorized copies</u> of the music in the United States and then distributed those copies abroad, his conduct might have given rise to a cause of action under the Copyright Act because a predicate act of infringement -- namely, the making of infringing copies -- would have occurred within the United States.  <u>Compare, e.g.</u>, <u>Update Art</u>, 843 F.2d at 73.  Because Defendant apparently possesses distribution rights of the sheet-music within the United States, however, Plaintiffs have not alleged that the sheet-music was copied unlawfully.  Accordingly, no predicate infringing act occurred within the United States.[7]

---

[7] The Court recognizes that there is a split of authority on the question of whether transmitting a television signal from the United States to Canada is actionable under the Copyright Act. The Ninth Circuit has held that it is not, because conveyance of the programming occurs in Canada; while the Southern District of New York, in an unpublished opinion, has held that it is, because the act of transmission occurs within the United States.  <u>Compare</u> <u>Allarcom Pay Television, Ltd. v. General Instrument Corp.</u>, 69 F.3d 381 (9th Cir. 1995), <u>with</u> <u>National Football League v. PrimeTime 24 Joint Venture</u>, No. 98-3778, 1999 WL 163181 (S.D.N.Y. Mar. 24, 1999).  Nonetheless, <u>PrimeTime 24</u> is pitch-perfect in affirming the proposition that for distribution abroad to be actionable, the defendant must have done some "domestic predicate act which is itself an act of infringement in violation of the United States copyright laws."  <u>Id.</u> at *3 (citation omitted).  It

To be clear, the unauthorized distribution of a work in the United Kingdom, by mailing the work from the United States to the United Kingdom, does not constitute infringement under the Copyright Act.  Section 106(3) creates a right of distribution in the United States only; any right of distribution that exists in the United Kingdom is a manifestation of British law.  Plaintiffs treat the copyright laws of disparate nations as if they comprise a seamless ensemble, with infringement of any one's law enforceable wherever the act was committed.  Of course, this Court's subject-matter jurisdiction is limited to cases arising under the Copyright Act; it has no power to vindicate violations of British law.  See L.J. Kutten, 3 Computer Software Protection § 13:33 (WL 2009) ("It is basic law that one cannot sue in a foreign country alleging violation of U.S. law.  Similarly one could not sue for violation of a foreign copyright law in a U.S. district court.").  By way of illustration, the Court offers the following analogy.  American libel laws are more permissive than corollary British laws, which adhere to a strict liability regime even for faultlessly inaccurate statements about public figures.  See Sarah Staveley-O'Carroll, Libel Tourism Laws: Spoiling the Holiday and Saving the First Amendment?, 4 N.Y.U. J. L. & Lib.

---

is unclear how the PrimeTime 24 Court reached the conclusion that transmission into Canada is "itself an act of infringement in violation of the United States copyright laws," however.  Notwithstanding this conclusion, the Court today applies the same legal rule as that applied in PrimeTime 24.

14

252 (2009).  Accordingly, a publication mailed from New York to London might be regarded as libelous, and therefore actionable, in the United Kingdom, while perfectly lawful in the United States.  The mere fact that the sender perpetrated a British tort from the United States does not give rise to a cause of action in American courts.  Similarly here, the mere fact that Defendant may have perpetrated a violation of British copyright law from the United States does not establish infringement under the Copyright Act.  This consequence is demanded by the interest of comity for the courts of other nations.  See <u>American Banana Co. V. United Fruit Co.</u>, 213 U.S. 347, 356 (1909) (discussing "the comity of nations").  Just as a blues musician is not expected to perform classical opera, this Court is ill-equipped to determine the scope of Plaintiffs' European distribution rights.

    D.    **PRO-IP Act**

Finally, the Court requested that the parties prepare supplemental briefing to address whether a recent amendment to the Copyright Act, 17 U.S.C. 602(a)(2) <u>as amended by</u> the Prioritizing Resources and Organization for Intellectual Property Act of 2008 ("PRO-IP Act") Pub. L. No. 110-403, 122 Stat. 4256 (2008)), affects the disposition of the pending motion.  All parties agreed that it does not.  (Pl.s' 1st Supp. Br. 1; Def.'s 1st Supp. Br. 1.)

The PRO-IP Act added an exportation right to the Copyright

15

Act. Defendant's supplemental brief argues that the new exportation right, by its terms, applies only to "exportation of infringing items . . . from the United States . . . of copies . . . <u>the making of which</u> . . . constituted an infringement of copyright." 17 U.S.C. § 602 (emphasis added). Here, there is no allegation that the infringing copies were <u>made</u> in violation of copyright; Plaintiffs allege only that the distribution of the (otherwise lawful) copies infringes upon their license. This position is certainly consistent with a plain reading of the statute, and since Plaintiffs agree that the exportation right does not apply here,[8] the Court need not decide its scope.

Although the exportation right does not apply here, the discussion of the new right in the leading copyright treatise raises an acute concern that is relevant to the motion now before this Court. Addressing the case of "an infringer who exports a [licensed product abroad] without any color of authority . . . ," Nimmer on Copyright explains:

> To the extent that the suit alleges [a] violation of the exportation right created under U.S. law, the wording of the statute is unclear whether it allows [the foreign license-holder] to file suit . . . . The legislative history fails to address the matter. Given how unprecedented such an expansion of standing would be,

---

[8] Plaintiffs take the position that the PRO-IP Act only <u>criminalizes</u> unlawful exportation and does not apply to a civil enforcement action such as this one. Although this position seems out of sync with the explanation of the Act in Nimmer on Copyright, it is undisputed, at the very least, that the PRO-IP Act does not apply to this case.

16

> courts should think long and hard before opening the floodgates in that manner.

Melville B. Nimmer & David Nimmer, 2 Nimmer on Copyright § 8.11[B][2] (Rev. Ed. 2009). The Court agrees that enabling those in Plaintiffs' position to bring suit in United States courts would open the floodgates to an unmanageable number of new actions.

Plaintiffs complain that the Court's decision today will leave them without any remedy, since British courts have no means to enforce an injunction against an American company. If indeed Plaintiffs had no viable remedy, this would certainly weigh as a countervailing consideration to Nimmer's warning of "opening the floodgates." The Court, however, rejects Plaintiffs' premise. As they conceded at oral argument, Plaintiffs can continue to enforce the British judgment against Defendant by bringing damages actions in the United Kingdom as new instances of infringement arise.[9] Although it may be most efficient for Plaintiffs to pursue Defendant in a United States court, this course is certainly not Plaintiffs' only enforcement option.

## CONCLUSION

Because Plaintiffs lack statutory standing to bring this

---

[9] It also seems that plaintiffs could demand that a copyright owner (or licensor) bring an action for breach of contract against a distributor-licensee like Defendant that has distributed the work outside the territory covered by its license.

17

lawsuit, the Court must grant Defendant's motion to dismiss for lack of subject-matter jurisdiction and for failure to state an actionable claim.  An accompanying order will issue this date.

                                                    s/Renée Marie Bumb
                                                    RENÉE MARIE BUMB
                                                    United States District Judge